

# NUMBER 13-13-00186-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JUAN FRANCISCO CASTRO, Appellant,

v.

MARIVEL CASTRO, Appellee.

## On appeal from the 28th District Court
## of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Benavides
### Memorandum Opinion by Justice Rodriguez

Appellant Juan Francisco Castro challenges the jury's verdict in favor of appellee

Marivel Castro on her intentional infliction of emotional distress (IIED) claim. By two

issues, Juan argues that the evidence was legally and factually insufficient to: (1) show

that he subjected Marivel to IIED; and (2) support the mental anguish damages awarded

by the jury. We affirm.

## I. Background

Appellant and Marivel met at church in 2005 and, after dating for over a year, were married in January 2007. During the marriage, M.R., Marivel's daughter from another marriage, lived with the couple. Marivel became pregnant in December 2007, but miscarried a month later. Marivel became pregnant again in March 2008, and in December 2008, the couple's son, C.D.C., was born. It is undisputed that appellant and Marivel's marriage was tumultuous; the degree of discord, and who was to blame for it, was hotly disputed by the parties in this case.

Throughout 2009 and early 2010, appellant and Marivel separated multiple times. Appellant filed for divorce from Marivel in April 2010. Marivel answered the divorce petition and filed counterclaims for assault and IIED. The divorce and tort proceedings were severed. The parties entered an agreed decree of divorce,[1] and Marivel's tort claims proceeded to trial.

### A. The Testimony

At trial, Marivel testified that appellant was physically and emotionally abusive throughout their marriage. She testified that appellant was very controlling—that he would not let her spend money, would not let her wear make-up, and prevented her from seeing her parents and other members of her family on several occasions.

In her testimony, Marivel recounted numerous specific events. She testified that while they were dating, appellant showed signs of jealousy; the October before their

---

[1] The couple's divorce is not before us in this appeal.

2

January 2007 wedding, he slapped her when he discovered a voicemail on her phone from a male friend. Marivel testified that on their honeymoon in Jamaica, appellant told her that his first wife and the children from that marriage would always come first and called her a "bitch" for having her hair braided.

The next incident Marivel recounted occurred around Christmastime in 2007. Marivel testified that she was pregnant at the time and that she and appellant had an argument over whether appellant should visit his mother in Brownsville and take her to see her family in Mexico. Marivel testified that appellant became so enraged during this argument that he punched a hole in the wall. Marivel testified that, on New Year's Eve of that year, appellant pointed a gun at her because he did not like the tone of a question she had asked him.

Marivel then had a miscarriage in January 2008. Marivel testified that appellant told her he did not believe she was ever pregnant and that he did not comfort her after the miscarriage. Marivel became pregnant again in March 2008. She testified that appellant continuously denied she was pregnant, and when he did acknowledge the pregnancy, he denied that he was the father of the baby. Marivel testified that appellant told her throughout the pregnancy that the baby was going to die or she was going to die. She testified that appellant refused to allow Marivel to buy things for the baby or set up a nursery because the baby was going to die before it was born. Marivel testified that in the weeks before their son was born in December 2008, she bought the things to set up a nursery while appellant was on a trip to Mexico. When appellant discovered that Marivel had made these purchases, he cancelled her credit card.

3

Marivel next described an incident that occurred on her birthday in December 2008, approximately two weeks after C.D.C. was born. Marivel testified that one of M.R.'s friends had told appellant that M.R. was going to commit suicide.[2] In response, appellant sent M.R. to her room. When Marivel's parents—M.R.'s grandparents—came to visit for Marivel's birthday, appellant would not allow them to see M.R. Marivel's parents left in tears. Marivel testified that appellant would not allow her to see her parents after this incident for several days and that this caused her great distress because she was worried about how upset they were when they left that day.

Marivel testified that appellant referred to their anniversary as a "day of mourning." She testified that appellant compared her to a nurse in his office[3] who had a "perfect figure" and told Marivel she was fat. After Marivel went to a church women's retreat, appellant called her a lesbian for wanting to make friends with the women she met at the retreat. Marivel testified that appellant continually denied that C.D.C. was his son and refused to buy things for him; Marivel testified that she used M.R.'s child support to buy things for C.D.C. Marivel testified that, one time, appellant spit on her when she was holding C.D.C., who was an infant at the time. Marivel testified that, during her marriage to appellant, her mother was diagnosed with cancer, but she often chose not to visit her mother because she was ashamed of the bruises appellant had given her.

Marivel testified that appellant left the family twice: once in February 2009 for two weeks; and a second time that summer, from June to September 2009. Marivel testified

---

[2] M.R. testified that she and the friend who told this to appellant had been fighting and suggested that the friend made the suicide comment to appellant in retaliation for the fight.

[3] Appellant is a physician.

4

that when appellant left in February 2009, he gave no explanation and Marivel did not know where he was. While he was gone in February 2009, appellant told Marivel that she was crazy and that he would only return home if she started taking Lithium; Marivel testified that this was less than two months after C.D.C. was born. During the time he left in the summer of 2009, Marivel testified that appellant paid the mortgage and utilities but did not provide anything else for the family.

Finally, Marivel described three particular incidents of physical violence. The first incident occurred in May 2009. Marivel testified that on one night in May 2009, she initiated sex with appellant. Marivel testified that the encounter quickly turned violent and appellant raped her.

The second incident occurred in June 2009, when Marivel, appellant, M.R., C.D.C., and appellant's niece, Angelina, travelled to Dallas. Marivel testified that she was driving on the car ride home. She testified that during the ride, she and appellant had an argument. She testified that appellant started the argument by denying that C.D.C. was his son. Marivel testified that she became angry and responded by complaining about appellant's mother. Marivel testified that appellant began punching her arm and backhanded her in the face. When they arrived home, appellant packed his things and left, telling Marivel that he had to leave or he would kill her; appellant told Marivel that he had been "thinking of ways to kill [her]."

The third incident occurred in April 2010, while appellant, Marivel, M.R., and C.D.C. were travelling to Brownsville to visit appellant's mother. Marivel testified that appellant was driving. She testified that appellant was "picking on" M.R., which started an

5

argument. During the argument, appellant told Marivel that he was never going to treat C.D.C. as well as his first children. Marivel testified that this made her angry, and she responded by calling appellant's mother "the devil." Marivel testified that appellant then began hitting her.

On cross-examination, when asked whether she filed any police reports because of appellant's behavior, Marivel testified that she filed a report in June 2009 after the incident in Dallas. She included the rape in that report, but the Corpus Christi police ultimately dismissed the case because the precipitating event occurred outside their jurisdiction. Marivel testified that she never pressed charges concerning the rape or other physical abuse. She also did not tell her gynecologist about the rape, even though she went to see him the next day. She testified that she never told anyone about the incident in Jamaica.

Marivel also admitted on cross-examination that she was jealous and insecure during her relationship with appellant. She testified that she had read his emails and had talked to people at appellant's office because she was afraid appellant was having an affair with the nurse with the "perfect figure."

M.R. also testified. She was in her early teens during appellant and Marivel's marriage. M.R. confirmed Marivel's account of the two car incidents. She testified that appellant backhanded her mother in both incidents and told Marivel that it was her fault, that she "deserved that kind of thing," and that she "made [him] do that." M.R. testified that appellant yelled frequently and physically disciplined her. She testified that she repeatedly asked her mother to call the police and report appellant.

6

On cross-examination, M.R. testified that the family took many road trips together and that the two incidents described by Marivel were the only two trips on which appellant was violent. She testified that she was wearing headphones on the ride to Brownsville, but that she turned them off when she realized her mother and appellant were arguing.

The last witness called by Marivel was appellant. In his testimony, appellant admitted that he punched a hole in the wall and admitted that he hit Marivel in the car in Dallas, but not on the mouth. Appellant denied the Jamaica incident and the New Year's Eve gun incident. Appellant denied that he hit Marivel on the way to Brownsville and testified that he merely pushed her face.

Appellant's first witness, Rita Stowbridge, was his ex-wife. She testified that appellant never abused her and that she never feared him. She testified that in April 2010, Marivel told her that appellant had been abusive; Stowbridge was very surprised by Marivel's accusations. Marivel told Stowbridge that appellant was having an affair and that she was going to use that to get the "most out of" the divorce. Stowbridge felt like Marivel wanted to take revenge on appellant.

Next, appellant called Olive Elizabeth Whittaker. Whittaker testified that she had worked with appellant as his "right hand" person for over a decade at his private family medicine practice and then at the Texas A&M Health Science Center. Whittaker testified that her family and appellant's were also close friends. Whittaker testified that appellant handles stress well and that she never saw appellant exhibit abusive behavior toward either his first or second family.

Whittaker testified that appellant was very happy when he started dating Marivel,

7

and that he was more romantic and open with his feelings. She testified that Marivel was a very jealous and vindictive person. When Marivel discovered what she considered to be suspicious text messages on appellant's phone from one of his employees, she told Whittaker that she was going to forward them to the employee's husband. Whittaker testified that she also discovered that Marivel had been checking appellant's work emails. Marivel never told Whittaker about any abuse. Whittaker testified that she was at the hospital when Marivel miscarried in January 2008. She testified that appellant was consoling Marivel.

On cross-examination, Whittaker affirmed that she feels loyal to appellant. She testified that she would believe appellant over Marivel.

Appellant's next witness was his niece, Melva Angelina Cervantes. Cervantes was in the car during the alleged incident in Dallas in June 2009. Cervantes testified that Marivel was driving and the couple was arguing. She testified that Marivel was cursing and that appellant tried to put his hand over Marivel's mouth, but denied that appellant hit Marivel. During the remainder of the trip, Cervantes testified, Marivel cursed and appellant remained silent; in particular, Marivel told appellant, "I'm going to get you motherfucker. I'm going to get you." Cervantes testified that they stopped in San Antonio at appellant's sister's home on their way back to Corpus Christi. Cervantes testified that, at her aunt's home in San Antonio, Marivel acted as if everything was normal, despite everything that had just transpired in the car.

Cervantes testified that she had a close relationship with M.R., but that M.R. had never told her about any abuse. She testified that there were lots of arguments in Marivel

8

and appellant's home, but that most of those arguments seemed like regular marital disagreements.

Finally, appellant testified. He testified that he realized the marriage was truly troubled after the June 2009 Dallas incident. He largely denied the abuse allegations and implied that Marivel was manipulative:

> Q: And what happened when you arrived at your house [after the June 2009 incident on the road in Dallas]?
>
> A. Well we arrived there, I want to say around 11 [p.m.], plus or minus a few minutes, and I already knew what I was going to do. You know, this [is] not right, this is just not right. So I started packing whatever I could at the moment. I just needed some clothes to continue for the next couple of weeks or so. So I just, maybe I was there 15, maybe 20 minutes at the most, packing. I put—all my clothes were in the bedroom. So I went over there—she would come in and tell me not to leave and I'm sorry. And I had heard that story so many other times and she is very good about tears.
>
> At first they used to work well on me. I think that is part of the reason why I got married, because she can get to people and she can make people believe those tears. So I did fall for her, and this time not too much, I just couldn't fall for that anymore . . . .

He admitted that he hit the wall during their December 2007 argument, but denied that he made the hole depicted in the picture admitted as evidence by Marivel. He denied making the statements about C.D.C. dying while Marivel was pregnant. He again denied the gun incident and denied that he ever threatened to kill Marivel.

Appellant testified that Marivel became increasingly aggressive as the marriage progressed. He testified that Marivel cursed regularly, that she called him the "M-F word," "wet back," and "fucking Mexican." Appellant testified that he believed Marivel misled him about herself while they were dating. As an example, appellant testified that

9

he discovered that Marivel had never graduated from high school. Appellant testified that he never intentionally caused Marivel distress.

## B. The Verdict

After the close of evidence and argument by counsel, the trial court submitted a charge to the jury on both the assault and IIED claims. The assault question asked: "Did Juan Castro sexually assault Marivel Castro?" The jury answered "no" to this question. The IIED question asked:

> Did Juan Castro intentionally inflict severe emotional distress on Marivel Castro?
>
> Intentional infliction of emotional distress occurs when the defendant acts intentionally or recklessly with extreme and outrageous conduct to cause the plaintiff emotional distress and the emotional distress suffered by the plaintiff was severe.
>
> "Extreme and outrageous conduct" occurs only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

The jury answered "yes" to this question. For the IIED claim, the jury awarded $30,000 in damages for past mental anguish and $45,000 in damages for future mental anguish.

## II. Standard of Review and Applicable Law

Appellant challenges the legal and factual sufficiency of both the jury's liability and damages findings. We will sustain a legal-sufficiency or no-evidence challenge if the record shows: (1) the complete absence of evidence of a vital fact; (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson*,

10

168 S.W.3d 802, 810 (Tex. 2005). When reviewing a no-evidence challenge, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *Id.* at 807. The ultimate test for legal sufficiency is whether the evidence would enable reasonable and fair-minded people to make the finding under review. *Id.* at 827. In reviewing a no-evidence issue, the court indulges every reasonable inference in support of that finding. *Id.* at 822.

"Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary." *Id.* at 819. "Most credibility questions are implicit rather than explicit in a jury's verdict." *Id.* Therefore, reviewing courts must assume that the jurors decided all credibility questions in favor of the verdict if reasonable persons could do so. *Id.* "Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." *Id.*

In reviewing a factual-sufficiency challenge to a jury finding on an issue on which the appellant did not have the burden of proof, as is the case here, we set aside the verdict only if the evidence that supports the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Ins. Network of Tex. v. Kloesel*, 266 S.W.3d 456, 469–70 (Tex. App.—Corpus Christi 2008, pet. denied). In our factual-sufficiency review, we consider and weigh all the evidence, but like in our legal-sufficiency review, we defer to the jury as the

11

sole judge of the witnesses' credibility. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex. 2001); *see Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The jury may choose to believe one witness over another, and a reviewing court may not impose its own opinion to the contrary. *Golden Eagle Archery*, 116 S.W.3d at 761.

### III. Intentional Infliction of Emotional Distress

By his first issue, appellant argues that the "gap-filler" tort of IIED was unavailable to Marivel under the facts of this case. Appellant also argues that the evidence showed that, in the context of appellant and Marivel's marriage, the complained-of conduct was not so outrageous such that it rose to the level of IIED.

### A. Applicable Law

To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998). Extreme and outrageous conduct is conduct "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"[4] *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex. 1999); RESTATEMENT (SECOND) OF TORTS § 46 cmt. d []. It is for the court to determine, in the first instance, whether a defendant's conduct was extreme and outrageous. *GTE Southwest, Inc.*, 998 S.W.2d at 616; RESTATEMENT (SECOND) OF TORTS § 46 cmt. h. But when reasonable minds

---

[4] We note that the law included in the jury charge in this case corresponds with the governing case law. *See Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005) ("The sufficiency of the evidence must be measured by the jury charge when, as here, there has been no objection to it."); *see also Barnes v. Mathis*, 353 S.W.3d 760, 764 (Tex. 2011) ("[W]e must measure the sufficiency of the evidence based on the jury charge.").

> may differ, it is for the jury, subject to the court's control, to determine whether, in the particular case, the conduct was sufficiently extreme and outrageous to result in liability. *GTE Southwest, Inc.*, 998 S.W.2d at 616; RESTATEMENT (SECOND) OF TORTS § 46 cmt. [] h.

*Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004).

> However, the tort of IIED is first and foremost a "gap-filler" tort which was created for the 'limited purpose of allowing recovery in those rare instances where a defendant inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress. *Hoffmann-La Roche, Inc.*, 144 S.W.3d at 447 (citing *Standard Fruit & Vegetable Co., Inc.*, 985 S.W.2d at 68). The tort's clear purpose is to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied. . . . The tort of IIED "simply has no application when the actor intends to invade some other legally protected interest, even if emotional distress results." *Hoffmann-La Roche, Inc.*, 144 S.W.3d at 447 . . . . Thus, where the gravamen of a plaintiff's complaint is really another tort, IIED is not available as a cause of action. [*Id.*] at 447–48 . . . .

*Moser v. Roberts*, 185 S.W.3d 912, 915–16 (Tex. App.—Corpus Christi 2006, no pet.) (some citations omitted). In short, "[i]ntentional infliction of emotional distress is not available as a cause of action unless the actor intended to cause severe emotional distress, or such distress is a primary risk of the conduct." *Conley v. Driver*, 175 S.W.3d 882, 887–88 (Tex. App.—Texarkana 2005, pet. denied). If the complained-of conduct "is intended or primarily likely to produce severe emotional distress, [IIED] is the applicable theory of recovery, even if the actor's conduct also produces some other harm." *Id.* at 88; *see Standard Fruit & Vegetable Co.*, 985 S.W.2d at 67 ("[I]f conduct is intended or primarily likely to produce severe emotional distress, section 46 [of the Restatement] is an applicable theory of recovery even if the actor's conduct also produces some other harm, such as physical injury.")

**B. Analysis**

13

### 1. IIED as a Gap-Filler

Appellant first argues that "Marivel's complaints involved torts other than IIED," that "her allegations that would show an assault cannot also show IIED," and, as such, she cannot recover under the additional theory of IIED. In support, appellant points to Marivel's pleadings, which he asserts "jumbled together the two distinct theories of recovery,"[5] and to closing argument by Marivel's counsel, in which counsel pointed to the emotional abuse evidence as evidence that proved the assault. In light of these circumstances, appellant argues that the jury's rejection of Marivel's assault claim "precludes her recovering on the same facts for IIED." We disagree with appellant for several reasons.

First, the jury was not privy to Marivel's pleadings, and the pleadings do not inform our sufficiency review. We review the sufficiency of the evidence based on the charge submitted to the jury, and the charge submitted to the jury in this case included a distinct IIED question and detailed definition of that tort. *See Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005) ("The sufficiency of the evidence must be measured by the jury charge when, as here, there has been no objection to it."); *see also Barnes v. Mathis*, 353 S.W.3d 760, 764 (Tex. 2011) ("[W]e must measure the sufficiency of the evidence based on the jury charge.").

---

[5] Marivel's counterclaim included the following allegation: "Defendant Juan Castro has systematically and continuously physically and verbally assaulted Plaintiff Marivel Castro and he has intentionally inflicted emotional distress on her. This conduct of continuous and systematic assaults and distress has resulted in physical pain and suffering, mental anguish and suffering and disfigurement. These events occurred during the following months as follows: January 2007, March 2007, December 2007, and January 2008, March-December 2008, May 2009, June 2009, and April 2010 and through the marriage . . . ."

14

Second, we decline to base our decision on this sufficiency issue on the structure and organization of counsel's closing argument. The jury was instructed to base its answers only on the evidence admitted at trial and on the law included in the charge. Absent any evidence to the contrary, we presume that the jury followed these instructions. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009) (citing *Golden Eagle Archery*, 116 S.W.3d at 771) (holding that unless the record demonstrates otherwise, appellate courts must presume the jury followed instructions given in the jury charge).

Finally, there was evidence at trial that specifically showed a pattern of intentional and severe emotional abuse by appellant in addition to the alleged sexual assault. Marivel's testimony established that appellant exhibited a pattern of controlling and emotionally abusive behavior from the start of their relationship. M.R. confirmed that appellant would tell her mother that the abuse was her fault, that she "deserved that kind of thing," that she "made [him] do that." Before they were married, Marivel testified that appellant slapped and chastised her for communicating with a male friend. Starting on their honeymoon and continuing throughout the marriage, appellant told Marivel that he would always put his first family ahead of the family he built with Marivel. There was testimony that appellant kept Marivel from seeing her family and that when Marivel did have the opportunity to see her family, she was ashamed to do so because of the bruises that appellant's physical abuse had caused. Appellant accused Marivel of lying about her first pregnancy, even after she miscarried, and throughout her second pregnancy, appellant told Marivel that she and the baby were going to die. There was testimony that

15

appellant denied that C.D.C. was his son throughout Marivel's pregnancy and after C.D.C. was born. There was evidence that appellant refused to financially support C.D.C., and Marivel testified that she was forced to use the child support she received for M.R. to support C.D.C. The litany of emotional abuse included in Marivel's testimony also included the following:

- Appellant called their marriage anniversary a "day of mourning";

- Appellant compared Marivel to a nurse in his office with a "perfect figure," telling Marivel she was fat;

- Appellant called Marivel a lesbian after she made friends with several women at a church retreat;

- Appellant spit on Marivel when she was holding an infant C.D.C.;

- Appellant threatened Marivel with a gun;

- Appellant threatened to kill Marivel, stated that he had been "thinking of ways to kill [her]";

- Appellant left the family two times and did not tell Marivel where he was.

The other torts "available" to Marivel—appellant posits, in his brief, that Marivel could have brought claims of regular assault, defamation, and failure to provide support—do not redress the foregoing conduct raised by the evidence at trial. *See Moser*, 185 S.W.3d at 915 (citing *Hoffman-La Roche, Inc.*, 144 S.W.3d at 447; *Standard Fruit & Vegetable Co., Inc.*, 985 S.W.2d at 68). In other words, the evidence in this case demonstrated one of those "rare instances" in which a defendant inflicted on a plaintiff conduct so unusual that the victim had no other recognized theory of recovery but IIED. *See id.* at 915–16; *see also Conley*, 175 S.W.3d at 888 (holding that where the plaintiff produced evidence of several emotional abuse separate and apart from the physical

16

assault, she could recovery for IIED in addition to assault). We are not persuaded by appellant's arguments to the contrary. The evidence was sufficient to show that appellant intended to cause Marivel severe emotional distress. *See Conley*, 175 S.W.3d at 887–88. That appellant's conduct also inflicted physical harm at some points during the marriage does not vitiate the applicability of IIED tort in this case. *See id.*; *see also Standard Fruit & Vegetable Co., Inc.*, 985 S.W.2d at 67.

### 2. Was appellant's conduct sufficiently extreme and outrageous?

Appellant further argues that, even were we to conclude that the evidence showed conduct that was properly characterized as "gap-filler" IIED conduct, which we have done, that conduct did not rise to the level of outrageousness required under the law. Appellant argues that the evidence at trial showed nothing more than typical marital strife. Again, we disagree.

We note that the testimony at trial was highly contradictory. However, it was solely the jury's job to resolve conflicts in the testimony, and its verdict demonstrates that it credited Marivel's version of events over appellant's. *See City of Keller*, 168 S.W.3d at 819. No matter our view of the evidence in this case, we are not permitted to pass judgment on the credibility of the witnesses or determine what weight to give to what evidence. *See City of Keller*, 168 S.W.3d at 819; *Golden Eagle Archery*, 116 S.W.3d at 761; *Dow Chem. Co.*, 46 S.W.3d at 242. In other words, to reverse in this case would require this Court to sit as the thirteenth juror and make the opposite finding from the jury—we are strictly prohibited from doing so.

The version of events advanced by Marivel, and as detailed above, showed an

17

intentional pattern of conduct that was so outrageous in character that it exceeded all possible bounds of decency—even in the context of a marriage. Appellant cites no case law, and we find none, exempting a person from liability for the conduct alleged in this case merely because it occurred in a troubled marriage. In his brief, appellant reduces his conduct to "rude[ness]," to "being cheap," to "name-calling," and to "not being emotionally supportive." It would not have been unreasonable for the jury to determine that appellant's conduct was more severe than that. In addition to appellant's "cheap[ness]" and "name-calling," there was testimony that appellant threatened Marivel with a gun; threatened to kill Marivel; harassed Marivel throughout her pregnancy, telling her the baby was going to die; continually denied that C.D.C. was his son; and repeatedly told Marivel that he would always put his first family ahead of theirs. From this, a reasonable juror could have concluded that appellant's conduct was more than mere insults, indignities, or threats or discord normally resulting from an unhealthy marriage. *See Hoffmann-La Roche*, 144 S.W.3d at 445 (citing *GTE Southwest*, 998 S.W.2d at 612). The jury could have reasonably concluded that appellant's conduct was extreme and outrageous, atrocious conduct that should not be tolerated in a civilized community. *See id.* (citing *Twyman*, 855 S.W.2d at 621).

### 3. Summary

Indulging every reasonable evidentiary inference in support of the verdict, we conclude that a reasonable juror in this case could have determined that appellant intentionally inflicted emotional distress on Marivel. *See City of Keller*, 168 S.W.3d at 807, 827. We also conclude that the evidence was not so weak that the jury's verdict

18

was clearly wrong or manifestly unjust. *See Cain*, 709 S.W.2d at 176. Appellant's first issue is overruled.

## IV.  Mental Anguish Damages

By his second issue, appellant argues that the evidence was insufficient to support the past and future mental anguish damages awarded by the jury. Appellant argues that Marivel's testimony as to the distress she suffered was too brief and conclusory to show that the IIED caused her a high degree of mental distress that substantially disrupted her daily routine.

### A.  Applicable Law

Texas law defines mental anguish as a "relatively high degree of mental pain and distress." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). "It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation." *Id.* We will uphold an award of mental anguish damages against an evidentiary sufficiency challenge when the claimant has "introduced direct evidence of the nature, duration, and severity" of her mental anguish that establishes a "substantial disruption" to her daily routine. *Id.*; *see Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011); *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002). An award of mental anguish damages may also be supported by some evidence of "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Parkway Co.*, 901 S.W.2d at 444 (quoting *J.B. Custom Design & Bldg. v.*

19

*Clawson*, 794 S.W.2d 38, 43 (Tex. App.—Houston [1st Dist.] 1990, no writ)).

In reviewing a mental anguish award, we must be tolerant of the limits of proof in this realm; indeed, "[t]he process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (quoting *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex.App.—Fort Worth 2005, no pet.)).  Given this lack of objective measures, so long as some compensable mental anguish has been established, the task of fixing the exact amount of damages is "generally left to the discretion of the fact finder." *Id.* (quoting *Pentes Design, Inc. v. Perez*, 840 S.W.2d 75, 80 (Tex. App.—Corpus Christi 1992, writ denied)).  But the discretion of a fact-finder in awarding damages for mental anguish is not unlimited.  Although recognizing that juries must be afforded "a measure of discretion in finding [mental anguish] damages", the Supreme Court of Texas has still held that "[t]here must be evidence that the amount is fair and reasonable compensation." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).

## B.  Evidence and Analysis

Here, Marivel testified that she suffered severe emotional distress as a result of each abusive event she described.  In particular, we note that Marivel testified that she blames herself for her January 2008 miscarriage "because she should have left."  She testified that she cried throughout her entire pregnancy with C.D.C. because of appellant's continuous comments that she or the baby were going to die.

20

Marivel testified that the bruises appellant gave her caused her great shame and humiliation; she testified that she was so ashamed of the bruises, she did not go visit her mother during her mother's cancer treatment. Marivel testified that it "broke her heart" when appellant would not let her see her family.

Marivel testified that she felt "belittled" throughout their marriage. She testified that the extreme anger and obscene insults appellant directed at Marivel were constant, that this happened "all the time." M.R. confirmed in her testimony that appellant yelled frequently. Marivel testified that appellant would not allow her to wear make-up because he thought it made her look like a prostitute. She testified that when appellant called her a lesbian after the church women's retreat, it harmed her "in a significant, emotional way" and still does to this day.

Marivel testified that she feared for her life during the marriage. She testified that she believed appellant was capable of carrying out his threats to kill her. After the alleged sexual assault, Marivel testified that she was so humiliated and embarrassed that she could not even tell her doctor about the assault.

Finally, Marivel testified about the current and future effects of appellant's abuse. On cross-examination, Marivel testified that she is no longer "physically afraid of [appellant], but [she's] hurt inside" and "feel[s] like [she's] damaged." On re-direct, she testified as follows:

Q: . . . And you have said in your examination with [defense counsel] that you feel hurt inside. You're damaged inside, I think is your word. Do you remember that?

A: Yes, sir.

21

Q:    The question to you [Marivel] is:   How do you see men these days? When you see a man with potential, a guy in your business, what's going on in your mind?   What's the mental process that's going on?

A:    I don't trust men.   I did date someone for a couple of — about two months.   I met him through a friend and the first thing he told me was that he couldn't have sex.   No, I'm lying.   He told me that he was waiting to have sex until he was married because he had been married before and had had bad relationships.   And I thought, you know, that's perfect because — but as we dated, it just brought back so many memories that I had of [appellant].

Q:    Did it interfere with your relationship?

A:    (Witness nodded).

Q:    Do you think you can even have a healthy relationship romantically with a man now?

A:    No.

Q:    Are you fearful at night?

A:    I can't sleep.   I —

Q:    When you hear music, romantic songs, what is your reaction to that?

A:    It's fake.

Q:    I'm sorry?

A:    It's fake.   It doesn't exist.

Q:    When you see couples walking on the street holding hands, what is your reaction to that?

A:    Same thing.

We first conclude that Marivel presented sufficient evidence of past mental anguish.   Her testimony was direct evidence that the conduct of appellant throughout their marriage caused her to continually suffer a high degree of emotional pain and stress.

22

As discussed above in our disposition of appellant's first issue, the conduct inflicted upon Marivel was more than the normal strife resulting from a troubled marriage. Rather, there was evidence that Marivel was subject to a constant barrage of emotional harassment and humiliation for, at the very least, the last two years of her marriage, and her testimony was sufficient evidence that she suffered a great amount of emotional distress as a result. She even implied in her testimony that the stress of her relationship with appellant caused her January 2008 miscarriage. This evidence established that not only did the pain Marivel suffer exceed mere worry, anxiety, vexation, embarrassment, or anger, but that her daily routine was disrupted. She cried continuously during her pregnancy with C.D.C. because of appellant's insistence that the baby was going to die. She was unable to see her family, to whom she was very close, as often as she liked because appellant either physically prevented her from doing so or she was ashamed to show her family the bruises appellant gave her. In short, we conclude that Marivel's testimony showed she suffered a high degree of mental pain in the past, and the jury did not err in awarding her damages on this basis.

We also conclude that the foregoing evidence provided sufficient basis for the jury's future mental anguish award. Marivel was required to show a reasonable probability that she would suffer compensable mental anguish in the future, and we believe that she did so. *See Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008) (per curiam) (citing *Fisher v. Coastal Transp. Co.*, 230 S.W.2d 522, 523–24 (Tex. 1950)). Marivel testified that, since her marriage to appellant, she cannot sleep at night. She testified that she is still significantly disturbed by the insults that appellant made

23

during their marriage. She testified that appellant's abuse has caused her to mistrust all men, and that this has already and will continue to prevent her from forming healthy relationships with men. Finally, she testified that she believes that all romantic love is fake. The continued stress and sleeplessness and Marivel's complete hopelessness over her chances for romantic love in the future are, again, more than mere worry, anxiety, and vexation. They will constitute a substantial disruption to Marivel's daily routine in her future life. And in combination with the severely abusive nature of appellant's conduct, this testimony was evidence from which the jury could have reasonably concluded that there was a reasonable probability that Marivel will suffer compensable mental anguish in the future. *See Adams*, 265 S.W.3d at 917; *see also Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 798 (Tex. 2006) (concluding that, in addition to the direct evidence, the severe beating received by the claimant, "provided an adequate basis for the jury to reasonably conclude that he would continue to suffer substantial disruptions in his daily routine"); *see also Finley v. P.G.*, No. 01-12-00619-CV, 2014 WL 346441, at *6 (Tex. App.—Houston [1st Dist.] Jan. 30, 2014, no pet.) (holding that, in addition to the direct evidence, the fact finder could have also properly considered severity of the assault suffered by the claimant in awarding future mental anguish damages).

Viewing all the evidence in the light most favorable to the jury's damages award and giving the jury the deference to which it is entitled under the law in fixing damage awards, we conclude that reasonable and fair-minded fact finders could have awarded Marivel past and future mental anguish damages. *See City of Keller*, 168 S.W.3d at 807, 827; *Saenz*, 925 S.W.2d at 614; *Figueroa*, 318 S.W.3d at 62. And considering and

weighing all the evidence, we cannot conclude that the evidence supporting the jury's mental anguish damages awards was so weak as to make the awards clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176. Appellant's second issue is overruled.[6]

## V.  Conclusion

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
31st day of July, 2014.

---

[6] We note that appellant raised a third issue in his initial brief concerning the completeness of the record.  But in his reply brief, noting that the record had been supplemented in the time since his initial brief, appellant abandons that issue as moot.  So we do not address it in this opinion.